IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 12-cr-00508-LTB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GREGORY WILLIAM BELL

    Defendant.

**DEFENDANT GREGORY BELL'S RESPONSE TO THE
GOVERNMENT'S BRIEF ON RESTITUTION**

Defendant Gregory William Bell, through his undersigned counsel and pursuant to the Court's order of May 1, 2013, hereby responds to the Government's Brief on Restitution.

**INTRODUCTION**

**I.    The Governing Standard**

In contesting the amount of restitution requested by the Government, Mr. Bell does not mean to minimize his offenses or trivialize any losses sustained by the victims. Nor does he seek to disavow any of the admissions or concessions he made in the plea agreement. The Court's task at this phase of the proceeding, however, is to "make[] a reasonable determination of appropriate restitution rooted in a calculation of *actual* loss." *United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008) (internal quotation marks omitted) (emphasis added). The plea agreement preserves Mr. Bell's right to present facts relevant to that determination so long as such facts do not contradict those to which he has already stipulated. *See* ECF Doc. 11 at 9. Specifically, the plea

agreement allows Mr. Bell to argue, as he does here, that the actual loss stemming from his offenses is significantly less than $6.9 million due to factual issues related to causation and loan forgiveness.  *Id.* at 13, n.11.

The Government acknowledges that any restitution award must be based on <u>actual</u> loss.  The very concept of actual loss distinguishes restitution from the loss calculation that determines the gravity of an offense under the fraud table of the Sentencing Guidelines.  The Tenth Circuit made clear in *Gallant* that loss under the Guidelines does not necessarily establish loss under the Mandatory Victims Restitution Act ("MVRA").  537 F.3d at 1247.  "Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain."  *Id.*  In construing the MVRA, the appeals court has often reasoned that its purpose "is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  *United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir. 2007) (internal quotation marks omitted); *see also United States v. Speakman*, 594 F.3d 1165, 1177 (10th Cir. 2010) (reiterating Circuit's views as to the compensatory as opposed to punitive nature of restitution).  "Consequently, a district court that orders restitution in an amount greater than the total loss caused by the offense thereby exceeds its statutory jurisdiction and imposes an illegal sentence."  *Serawop*, 505 F.3d at 1124 (internal quotation marks omitted).

It is in the spirit of these fundamental principles and the Government's burden to prove actual loss by a preponderance of the evidence, *Gallant*, 537 F.3d at 1247, that Mr. Bell disputes the Government's request for restitution in excess of six million dollars.  For the reasons explained below, Mr. Bell believes the Government has, in certain

instances, conflated issues of loss and restitution so as to arrive at an inflated restitution amount. In other instances, there is a basic lack of proof to justify the Government's request. Mr. Bell asks only that any restitution awarded be based on an actual loss figure derived from a rational and consistent approach that avoids double recovery and acknowledges the many factors that contributed to the victim's losses.

## II.     The Complexity Exception

If the Government cannot prove with reasonable certainty the amount of actual loss proximately caused by Mr. Bell's offenses, the Court should decline to order restitution altogether under the complexity exception set forth in 18 U.S.C. § 3663A(c)(3)(B). Under that provision of the MVRA,

> [A] sentencing court need not provide a restitution award to a victim if calculating the size of that award requires a determination of complex issues of fact related to the cause or amount of the victim's losses and would therefore complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

*Gallant*, 537 F.3d at 1251 (internal quotation marks omitted). The district court invoked this very exception in *Gallant*, declining to award restitution to the FDIC, explaining that the additional hearings that would be necessary to determine actual loss would conflict with the court's countervailing duty to "impose sentence without unnecessary delay." *Id.* (citing F.R.Cr.P. 32(b)(1)). The Tenth Circuit vacated that decision on other grounds. But in doing so, it acknowledged district courts' broad discretion to employ the complexity provision in cases where the need for restitution to a particular victim is outweighed by the difficult and time consuming process necessary to determine actual loss. *See id.* at 1254.

3

As the appeals court noted in an earlier case, the legislative history to the MVRA reveals that it was never intended as a vehicle to transform a criminal case into a forum for resolving facts and issues better suited to civil proceedings.  *See Serawop*, 505 F.3d at 1119.  To the contrary, in enacting the MVRA, Congress fully intended to keep within the civil realm claims of actual loss dependent on complicated proximate cause analyses and complex damages calculations.

> In all cases, it is the [Senate] committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution.  The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.

*Id.* (quoting S.Rep. No. 104-179, at 18-19, U.S.C.C.A.N. 1996 at 924, 932).

It is apparent from the Government's brief and this response that the question of actual loss in this case is far from straightforward.  To the extent the FDIC or individual borrowers suffered actual loss stemming from the offenses of conviction, determining the amount of that loss is complicated because most of the outstanding loans have been sold and the borrowers' repayment obligations have changed.  In addition, as discussed below, the Government's restitution theory relating to the Kruse loan suffers from a fatal lack of causation.  Under these circumstances, the Court would act well within its discretion in invoking the complexity exception so as to decline restitution entirely or as to any particular victim.

## DISCUSSION

**I.      Loan One on Gov. Ex. 1 (Kruse Loan)**

The Government seeks restitution in the amount of $2,220,862 on behalf of the FDIC in relation to loan number one, which underlies the charge at issue in Count 1 of the Information.  Count 1 concerns a series of loans made to Daniel and Susan Kruse for the purpose of buying dairy cows that the couple then leased to a dairy farm owned by John Johnson.  As explained in pages 10 through 13 of the plea agreement, the Kruses pledged as collateral for the original loan a $100,000 certificate of deposit.  The couple purchased that CD with funds that had previously been deposited in their account by Susan's sister, B.F., who was then dating Mr. Bell.  B.F. gave the couple permission to use the funds to buy the CD and also agreed to the use of the CD as collateral for the loan.  Mr. Bell presented the loan application to the bank.  In doing so, he failed to disclose that his girlfriend, B.F., funded the purchase of the CD that was used as collateral.  This withholding of information is at the heart of the false entries charge to which Mr. Bell pled guilty in Count 1.

As set forth in the plea agreement, the Kruses eventually defaulted on their multimillion dollar loan.  It is clear, however, that the default and resulting loss to the FDIC had everything to do with the collapse of the dairy market and nothing to do with Mr. Bell.  It is also clear that Mr. Bell's withholding of facts relating to the ownership of the CD was not a proximate cause of the $2.2 million loss for which the Government seeks restitution.

In November 2009, the couple reached a settlement with the FDIC, documentation of which was provided in discovery.  *See* Ex. A.  Under the terms of that

settlement, the Kruses relinquished to the FDIC all their right, title, and interest in the CD that was originally purchased with B.F.'s money. The FDIC cashed the CD, ultimately recovering $126,682.42, proving that the collateral was worth even more than the amount originally pledged. *See* Ex. B (Johnson-Bell-Kruse Settlement spreadsheet) references to CD # 12312. Under these circumstances, the Government's request for restitution in the full amount of the FDIC's loss on this loan violates the fundamental rule that restitution be limited to loss proximately caused by the offense of conviction. *See United States v. West*, 646 F.3d 745, 751 (10th Cir. 2011) (explaining that restitution statute makes plain "Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction"). As the Tenth Circuit explained in *West*, the MVRA does not permit restitution for losses associated with conduct other than that for which the defendant was found or plead guilty. To the contrary, the court explained, "restitution may only be ordered for losses caused by the offense of conviction." *Id.* "The main inquiry for causation in restitution cases is whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *Id.* (internal quotation marks omitted); *see also Speakman*, 594 F.3d at 1171 (holding that for purposes of the MVRA, "the government must show both that the defendant's conduct is the 'but-for' cause of the individual's harm and that the defendant 'proximately' caused the harm").

The offense conduct underlying Count 1 was Mr. Bell's failure to disclose to the bank's loan committees that B.F.'s money was used to purchase the CD used as collateral and that he was in a personal relationship with B.F. But the withholding of this information did not cause the FDIC's loss. Rather, the loss stemmed from a clearly

identifiable intervening cause—the Kruse's inability to continue servicing their debt, which occurred when Johnson Dairy ceased making its monthly lease payments. This straightforward cause of the Kruse's default is revealed fully in the couple's settlement with the FDIC. Ex. A at 3. That same documentation shows that the collateral purchased with B.F.'s funds was fully realized. It is thus clear that Mr. Bell's offense conduct, which related to B.F.'s funding of that collateral, was not the proximate cause of any losses sustained in connection with loan # 1. Accordingly, Mr. Bell respectfully submits that no restitution should be awarded in connection with this loan.

II.     **Loan Two (Heifer Growing & Cow Lease Agreement)**

The Government seeks restitution on behalf of the FDIC in the amount of $737,045 as compensation for alleged losses sustained in connection with loan no. 2. As explained in the Government's brief, this request relates to a $9.3 million loan to Bell's parents for purposes of closing a heifer purchase & lease agreement. Mr. Bell pleaded guilty to misapplying $737,045 from the proceeds of that loan, as described on page 14 of the plea agreement. The Government's request for restitution in the full amount of the misapplied funds, however, ignores that the FDIC settled with the senior Bells. In that settlement, the FDIC recovered approximately $2.7 million or 28.9% of the outstanding principle balance on the $9.3 million loan. *See* Ex. B (reference to loan # 12247307). Accordingly, the fraction of the loan that Mr. Bell misapplied, $737,045, should also be reduced by 28.9% for a total restitution award of $523,301.

This method of calculating loss is consistent with the Government's own method for calculating loss in connection with loan no. 5, as explained on page ten of its brief. Approximately $1 million from the proceeds of loan no. 5 was used by John Johnson to

7

buy Bancorp stock. Johnson's settlement with the FDIC, however, resulted in significant asset and collateral recovery, which reduced the outstanding principal owed on his entire loan portfolio by approximately 25%. Consequently, the Government has likewise reduced the amount it seeks in restitution stemming from Johnson's $1 million stock loan by 25% and asks for $745,809. Applying this same approach to loan no. 2 mandates a reduction of approximately 28.9% to account for the asset and collateral recovery realized by the FDIC in settling with the senior Bells.

**III.   Loans Six through Ten (Stock Loans)**

Mr. Bell does not dispute that certain borrowers involved in Count 3 of the Information may qualify as victims under the MVRA.[1] Nor does he dispute that the amount of their individual loans used to purchase Bancorp stock is accurately reflected in Government Exhibit 1. What Mr. Bell does dispute, however, is the Government's overly simplistic method of calculating the actual loss sustained by these borrowers. The Government supports its request for restitution by claiming that each of the families at issue in Count 3 "repaid the money they borrowed to buy stock," and therefore, Mr. Bell should repay them that money. Government Brief at 9. This statement offers

---

[1] Mr. Bell acknowledges the viability of the Government's legal theory as to why these individuals and families constitute victims under the MVRA. In determining whether to award restitution, however, the Court should also be cognizant of the unique facts that distinguish this case from the typical investor case presenting loss issues under the MVRA. Most of the victims for whom the Government seeks restitution apparently do not consider themselves victims. Only two individuals returned Declaration of Victim Loss forms to the probation department, and the Government seeks restitution for only one of them. The propriety of any restitution award under these circumstances is questionable even if the Government can overcome the significant hurdles to proving actual loss discussed herein. *See Speakman*, 594 F.3d at 1175-79 (reversing order requiring restitution to be made to Crime Victims' Fund where victim explicitly declined restitution, and explaining that restitution is not mandatory where victim declines and would wrongly punish the defendant).

an intriguingly simple solution to the complex issue of loss before the court, but it is both inaccurate and incapable of proof. As set forth below, many of the borrowers in Count 3 had not repaid their loans when the FDIC assumed control of New Frontier Bank. Consequently, their loans, including the portions used to buy bank stock, were pooled and sold at auction at steep discounts. It appears that each of those borrowers subsequently negotiated a reduced principle amount. Other borrowers, including John Johnson and the Shables, settled directly with the FDIC, thereby reducing, in some cases significantly, the amount of their ultimate repayments on the stock loans. The Government's approach ignores these economic realities.

In awarding restitution, the Court must acknowledge the sweeping loan forgiveness realized by each of the borrowers after the FDIC assumed control of the bank, and it should not exclude from those discounts the portion of any loan used to buy bank stock. Indeed, given the pooling and auctioning that has taken place, it would be impossible to isolate a particular loan, much less a fraction of a loan. In sum, a fair and rational calculation of actual loss in this case must account for the significant debt forgiveness that took place after the bank's closure. Any other methodology would result in an impermissible windfall to the victims. *See United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009) (noting that restitution is intended to make the victims whole not to provide a windfall).

    A.    **The Teague Family**

The Government seeks restitution on behalf of the Teagues in the amount of $500,045.00, claiming that the Teagues used that portion of an $11 million loan to purchase Bancorp stock. Mr. Bell does not dispute that the Teagues invested

approximately $500,045 in Bancorp stock or that the money came from proceeds of a much larger loan. But Mr. Bell does dispute that the Teagues suffered actual loss in that amount stemming from his offense of conviction in Count 3. According to the FDIC's public website, after it assumed control of New Frontier Bank, the Teagues' loans, totaling $60,741,264, were pooled and sold at auction. The winning bidder paid $12,573,442 for that pool of loans, representing an approximately 80% discount. *See* Ex. C.[2] According to documents provided by the Government, Mr. Teague told a federal agent that he subsequently refinanced his loans through numerous lenders, including Colorado East Bank, Farm Credit, and First Western. Mr. Bell believes that the terms of that refinance significantly reduced the Teagues' total principle obligation to an amount known only to the Teagues, which they appear to be unwilling to share. Although invited to do so, the Teagues did not submit a Declaration of Victim Losses to the probation department. Mr. Bell contends that, unless and until the Government proves the amount of loss actually sustained by the Teagues as a result of their loan to buy stock, the Court should decline its request for restitution as to the Teague family.

    B.    Raymond L. Rossi

The Government seeks restitution on behalf of Mr. Rossi in the amount of $300,040.00. This amount is approximately $50,000 less than the amount to which Mr. Rossi claims he is entitled in his Declaration of Victim Losses, sworn to April 4, 2013. Mr. Bell contends this amount is inflated because Mr. Rossi did not suffer losses anywhere near $300,000 stemming from his loan to buy Bancorp stock. According to

---

[2] Ex. C sets forth sales information for Sale ID NFB-09-37005. At Mr. Bell's request, the Government provided the sale ID numbers corresponding to the loans at issue in Count 3.

the FDIC's public website, Mr. Rossi's loans, totaling $8,522,652, were pooled and sold at auction. The winning bidder, Summitbridge Credit Investments, LLC, paid $1,149,484 for that pool of loans, representing an approximate 86% discount. *See* Ex. D. Mr. Rossi told the FBI that he subsequently settled with Summitbridge, agreeing to pay a balance of $3.4 million, representing an approximate 60% reduction in the principle amount that he owed New Frontier Bank. Applying that reduction to the $300,040 in loan proceeds used to purchase stock results in approximately $117,000. Mr. Bell respectfully submits that, due to complexity and the Government's inability to prove actual loss, the Court should not award restitution to the Rossis. Regardless, any award in favor of the Rossis should not exceed $117,000.

      C.     **The Shable Family**

The Government seeks restitution on behalf of the Shable Family in the amount of $260,000. Mr. Bell disputes this amount and also disputes the Government's contention on page eight of its brief that the Shables repaid their stock loan in full. The Government has not provided any documentation of the Shables' repayment or settlement with the FDIC. Mr. Bell understands that the Shables settled directly with the FDIC, obtaining a $1 million writedown of their outstanding loan balance. Given the lack of discovery relating to the Shable family, and the fact that the Shables are not seeking restitution, Mr. Bell disputes the Government's bald request for $260,000.

### D.     The Schilderink Family

The Government seeks restitution on behalf of the Schilderinks in the amount of $500,045.[3]  Mr. Bell disputes this amount.  According to documents provided by the Government, the loan that funded the Schilderink stock sale was pooled with many others and sold at auction after the FDIC assumed control of the bank.  That pool, with a book value of $47,712,117, was sold at auction to Frontier Capital Group, Ltd. for $11,291,836.  Ex. E.  Mr. Schilderink told federal agents that he subsequently refinanced his loans with Frontier Capital.  Mr. Schilderink did not submit a Declaration of Victim Losses to the probation department.  In light of the lack of evidence that the Schilderinks suffered actual loss stemming from the stock loan and the fact that the Schilderinks are not seeking restitution from Mr. Bell, Mr. Bell contends that no award of restitution is warranted for this loan.

### E.     The Van Lith Family

The Government seeks restitution on behalf of the Van Lith family in the amount of $249,990.  Mr. Bell disputes this amount.  Like the loans discussed above, the loan that funded the Van Lith stock purchase was pooled with other loans and sold at auction after the FDIC assumed control of the bank.  According to Mr. Van Lith, the book value

---

[3] The Government states that the Schilderinks repaid their stock loan in full, along with the Hermans and Shables.  See ECF Doc. 30 at 8.  This appears to be a mistake, however.  Publicly available information and documents provided by the Government indicate that the Schilderink loans, including the loan to buy stock, were pooled and sold at auction.

of his outstanding loans sold at auction totaled approximately $11.8 million.[4] Those loans were sold to Sego Capital LLC for approximately $4.8 million. Mr. Van Lith reports that he ultimately negotiated a settlement with Sego, which reduced his principle balance from $11.8 million to $7.7 million for an approximate 35% discount. Applying that discount to the $249,990 used to buy stock results in approximately $162,493. Mr. Bell respectfully submits that, even if the Court resolves issues regarding proof, complexity and the absence of any request for restitution from the Van Lith family militate against any award in their favor. Regardless, any amount of restitution awarded to the Van Liths should not exceed $162,493.

Dated: May 28, 2013.

Respectfully submitted,

*s/Saskia A. Jordan*
Saskia A. Jordan
Cleo J. Rauchway
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax:    303.832.2628
Email:  sjordan@hmflaw.com;
crauchway@hmflaw.com
*Attorneys for Defendant*

---

[4] Mr. Van Lith reported this $11 million figure to the FBI in an April 2013 interview and it is consistent with other information known to Mr. Bell. The FDIC's public website erroneously lists the book value of Van Lith's loans as $1,388,142. Ex. F. This appears to be a typographical error resulting in the omission of the first digit.

## CERTIFICATE OF SERVICE

       I hereby certify that on May 28, 2013, I electronically filed the foregoing DEFENDANT'S RESPONSE TO GOVERNMENT'S BRIEF ON RESTITUTION with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Thomas M. O'Rourke, Esq.  
Assistant United States Attorney  
United States Attorney's Office  
1225 17th Street, Suite 700  
Denver, CO 80202  
Telephone: (303) 454-0100  
Fax: (303) 454-0402  
Email: Thomas.O'Rourke@usdoj.gov

Suneeta Hazra, Esq.  
Assistant United States Attorney  
United States Attorney's Office  
1225 17th Street, Suite 700  
Denver, CO 80202  
Telephone: (303) 454-1011  
Fax: (303) 454-0402  
Email: Suneeta.Hazra@usdoj.gov

       *s/Brenda Rodriguez*  
       Brenda Rodriguez